WILCOX et al. *v.* BEAL et al.

The object of the rule under which, in every case of a presentment of a bill for acceptance, the drawee is entitled, if he require it, to twenty-four hours to consider wether he will accept, is not to enable him to enquire as to the holder's title, but to ascertain whether he have effects of the drawer, or the prospect of them, or other reason for honoring the bill; and the acceptance of a bill at once, without taking advantage of this delay. is not of itself evidence of negligence or incautiousness, in not enquiring as to the title of the holder.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *Lockett and Goold*, for the appellants. *Flower* took the bill under suspicious circumstances, and not in the usual course of trade. When the maker of a note shows it got into circulation by fraud, the *onus* is on the holder. 6 Wendell, 615. 12 Ib. 484. 13 Ib. 605. The holder must be such *bona fide*, have taken the paper innocently in the usual course of trade, and need not account for his possession unless suspicion be raised. 3 Kent, 80. *Miller* v. *Race*, 1 Burr, 452. *Grant* and *Vaughan*, 3 Burr, 1516. *Peacock* v. *Rhodes*, 2 Douglas, 613. 2 Camp, N. P. 5. 13 East, 135. *Thurston* v. *McKown*, Mass. To preclude equities, the note must be transferred in the usual course of business, and without circumstances calculated to put a prudent person on his guard. *Snow* v. *Peacock*, 2 Carr. and Payne ; 13 Eng. Com. Law. *Lapice* v. *Clifton*, 17 La. 157. The claimant is not bound to show by what means he lost the bill, if it was taken under suspicious circumstances, although taken for value. *Down* v. *Halling*, 2 Carr. and Payne, 11; 12 Eng. Com. Law Rep. If the bill be taken under circumstances calculated to put a prudent person on his guard, although taken in the usual course of trade, no title is conferred. *Slater* v. *West*, 3 Carr. and Payne ; 14 Eng. Com. Law. *Rothschild* v. *Carney*, 17 Eng. Com. Law, 403. *Early* v. *Brockford*, 25 Eng. Com. Law, 1186. *Strange* v. *Wigney*, 19 Eng. Com. Law, 202. The expression, " usual course of trade," means that, the party shall take the bill in his business, and as a payment of a debt contracted at the time. *Coddington* v. *Bay*, 20 John. 651. *Payne* v. *Cutter*, 13 Wendell, 606. *Stalker* v. *McDonald*, 6 Hill, 93. *Rosa* v. *Brotherson*, 10 Wendell, 86. This rule is well settled. *Nicholson* v. *Patton*, 13 La. 217. The late Supreme Court adopted the rule laid down in *Gill* v. *Cubitt*, 3 Barn. and Cress, 466, and held that, in transactions like this, parties who buy negotiable paper with a view to profit, without making due enquiries as to the title of the seller, and merely because there are good names on the paper, take the risk of its being stolen. The doctrine was again recognized in *Lapice* v. *Cliffton*, 17 La, 158. See also *Vairin* v. *Hobson*, 8 La. 52. *Dupeux* v. *Troxler*, 8 La. 95. Story on Bills, § 194. *Louisiana State Bank* v. *New Orleans Navigation Company*, ante p. 294. *Lanfear* v. *Blossman*, 1 An. 156. In the case of *Little* v. *Boutin*, it was held that, negotiable instruments endorsed in blank, when stolen, were subject to the rules of law governing stolen property, as found in the Louisiana Code.

Tested by these principles, the plaintiffs case is put beyond controversy. If the case be taken out of the commercial law, then the bill of exchange, being like any other thing, the sale of it to *Flower*, was null. He did not buy it at auction; nor did he buy it of a person in the habit of selling such things. The language of a recent case, clearly defines the position of *Flower* with reference to the broker *June*. "If, on the hypothesis of the defendants, *Richards* had no principal, he had no possession but that based on fraud; and being publicly known as a broker, every one traded with him for the article at his peril, unless he put himself in communication with its owner. *Leverich* v. *Richards*, 1 An. R. 357.

Having shown that *Flower* took no title to the bill, the liability of *Beal*, its acceptor, remains to be considered. Two things must concur to charge him : 1. The fact that *Flower* had no title. 2. That *Beal* had due notice of this fact. The first is established. As to the second, the evidence shows, not only that he was notified as soon as the loss or theft was known to plaintiffs, but that an injunction was issued commanding him not to pay the bill.

After notice of the bill's being lost, the drawer pays it at his peril. See note to Chitty on Bills, 528.

The defendants complain that the bill was improperly remitted. The mode of remittance is conclusively shown to have been the usual one at the time. *Grymes*, on the same side.

*Eggleston*, for the defendant *Beal.* Story says that, the payment of a lost or stolen note by the maker, which has been endorsed in blank, to a *bona fide* holder, for a valuable consideration, will discharge him. Story on Promissory Notes, secs. 381, 382, 383, 384, 137, 196, 197, note (1). He asserts the same doctrine in his work on Bills of Exchange, secs. 415, 416. 417, 193, 194. He says: " For a considerable length of time, the doctrine prevailed that, if the holder took the bill under suspicious circumstances, or without due caution or inquiry, although he gave value for it, yet he was not to be deemed a holder *bona fide*, without notice." But this doctrine has been since overruled and abandoned, on the ground of its inconvenience and obstruction to the free circulation and negotiation of exchange and other transferrable paper. Note 3 to sec. 194.

*Wray*, for the defendant, *Flower.* The mode of transmitting the bill showed gross negligence on the part of plaintiffs, and they should make out a very strong case to entitle them to recover. 3 Bingham, 444. *Flower*, having given value for the bill, cannot be made liable though the bill were lost or stolen. Story on Bills, 193. But he was a holder in good faith. Plaintiffs must show notice, or such gross negligence as will amount to fraud. Story on Bills, s. 194. 10 Adolph. and Ellis, 784. *Flower* took the bill in the usual course of business.

*Watts*, on the same side. The judgment of the court was pronounced by SLIDELL, J. In November, 1838, *Huntington*, the agent at Vicksburg of *Wilcox*, *Anderson & Co.*, of New Orleans, forwarded a letter addressed to the plaintiffs by a steamboat going to New Orleans. This mode of transmission was the one usually adopted at that time, the mail being very irregular. The letter contained the first of a bill of exchange for $1,500, dated at Vicksburg, November 23, 1838, payable at sixty days after date, drawn by *Randolph* upon *Beal*, to the order of *Huntington*. The bill was endorsed by *Huntington*, not specially, but in blank. It appears that, at that time, there was great carelessness about letters thus sent. They were thrown on the table of the steamboat upon the boat's arrival, with the exception of money-letters, which were given in charge to the clerk. Letters thus sent sometimes disappeared, which was the case with the letter in question; for the plaintiff never received it, but afterwards received the second of the bill. On the 28th November, the first of the set was presented at *Beal's* counting house, and accepted by his clerk. On the same day *Flower* bought the bill at a discount of $35, from one *June* ; and, on the 24th December, 1838, got it discounted at the Bank of Louisiana, to which bank *Beal* paid it at maturity. On the 29th November, the plaintiffs presented the second of the bill for acceptance, which *Beal* refused on account of the prior acceptance. On the 21st January, 1839, the plaintiffs brought the present suit against *Beal* and *Flower.* It was charged that the bill had been stolen from the steamboat, that *Beal* accepted it without due caution and improvidently, and that it was discounted by *Flower* without due caution, or proper enquiry, and under circumstances which could not vest the property of the bill in him. *Flower* was enjoined against negotiating, and *Beal* against paying, the bill. Judgment was asked decreeing the bill to be paid to the plaintiffs, and for general relief.

The cause was not tried until the year 1847, and, as an interval of eight years had elapsed, it is not surprizing that there is some uncertainty as to the person by whom the lost, or stolen, bill was presented for acceptance. The clerk of *Beal*, who accepted it under a power of attorney, says it was a man named

*June.* Another clerk says it was not *June,* but an individual unknown to him, of perfectly genteel appearance. The argument of the plaintiffs' counsel assumed that *June* was the person who made the presentment; and was directed mainly to the points that he was a person of bad character, and also that the promptness of the acceptance was unusual. It is very clearly shown that *June* became a man of intemperate habits; but he had borne, for several years previously, a good character, and the testimony does not satisfy us that he had become a drunkard, and lost his reputation, at the time of the transaction. It was also urged that the nature of *June's* business made a presentment by him unusual, and should have excited the suspicions of the acceptor. It seems he was what the witnesses term a street broker; by which they explain themselves as meaning, one who goes about and sells bills and notes for a commission. We certainly cannot consider this as a circumstance throwing any imputation upon the good faith or even the prudence of the acceptor, especially when considered in connection with the business standing and social position of *June,* who had occupied an office in the commercial part of the town for a considerable time, doing a business which required the services of two clerks, and enjoying a good mercantile credit. We may also remark that, in a country where the distribution of labor is so imperfect as with us, and where people are in the habit of dealing in so many different ways, there was nothing to excite suspicion in the presentment of the bill by an individual pursuing the vocation which *June* then did.

Objection was made to the acceptance of the bill as unusual, because made immediately. In England the practice appears to be, to allow the drawee till the day after the presentment to determine whether or not he will accept; and Story, as he speaks without qualification, may be considered as recognizing it also as the american rule, that in every case of a presentment for acceptance the drawee is entitled, if he requires it, to have twenty-four hours to consider whether he will accept the bill or not; and that it is usual, in such cases, for the holder to leave the bill *with him during that period.* See Story on Bills, § 237. Chitty 305. But the reason of this rule is not that the drawee may make enquiry as to the holder's title, but that he may have an opportunity, before he determines whether he will accept or not, of examining his accounts and correspondence, and seeing whether he has effects of the drawer or the prospect of them, or other satisfactory reason for honoring the bill. The rule is one of mercantile courtesy to the acceptor, and for his convenience. And hence when the acceptor accepts at once, he must be considered as doing so because he is satisfied, without examination, that he has effects; and his promptness ought not to be imputed to him as a fault. *Beal's* book-keeper and agent, who accepted the bill, says the party was not requested to wait, because he knew the drawer's account was right, and had no su⸱ picion with regard to the holders. It is also in evidence that *Beal* was not in the habit of asking time for examination, being very well acquainted with the state of his accounts; and that the signatures of *Randolph* and *Huntington* were well known in his house.

As to the acceptance then of this bill we conclude that, there was not *mala fides* on the part of the drawee, nor even negligence. The next enquiry is, whether *Flower* is to be considered a *bond fide* holder. The district judge so treated him, and the evidence is not such as to authorize us to disturb his opinion. The bill was for $1,500, and had about sixty days to run. He gave $35 less than the face of the bill. The rate appears from the evidence not unusual; and is not such a reduction as a man in bad faith, buying a stolen bill,

would require. The fact that he bought from *June*, whose vocation and, standing we have already noticed, does not authorize us to say that he was in bad faith ; nor does the circumstance that *Flower* went to *Beal's* on the day of the purchase, throw a shade upon the transaction. The bill was accepted, not by *Beal* himself, but by his book-keeper, and the enquiry made by *Flower* was, whether the acceptance was good. This does not authorize the belief of alarm with regard to the ownership of the bill. We are, therefore, of opinion that the district judge did not err in dismissing the action. We have not considered it necessary, under the facts of the case, to say whether we are prepared to go to the full extent of the doctrine laid down by Story, and cited by the district judge. In speaking of the rights of the holder, that author observes : "For a considerable length of time the doctrine prevailed that, if the holder took the bill under suspicious circumstances, or without due caution and enquiry, although he gave value for it, yet he was not deemed a holder *bonâ fide*, without notice. But this doctrine has been since overruled and abandoned, upon the ground of its inconvenience and obstruction to the free circulation and negotiation of exchange and other transferable paper." And again in speaking of the duty of the acceptor, the same writer observes : "The reasonable doctrine now established is that, nothing short of fraud, not even gross negligence, if unattended with *malâ fides*, on the part of the acceptor or other party paying a bill, will invalidate the payment so as to take away the rights founded thereon." See Story on Bills, § 194, 416. The learned author was certainly sustained in this by very high authority. In *Goodman* v. *Harvey*, 4 Adol. and Ellis, we find the plaintiff's counsel expressly conceding that it could no longer be maintained that the holder of a bill is disabled from recovering if he has taken it under circumstances which might reasonably have awakened suspicion, but he contended " that gross negligence has the effect of fraud." But Lord Denman said : " I believe we are all of opinion that gross negligence only, would not be a sufficient answer, where the party has given consideration for the bill. Gross negligence may be evidence of *malâ fides*, but is not the same thing. We have shaken off the last remnants of the contrary doctrine. Where the bill has passed to the plaintiff, without any proof of bad faith in him. there is no objection to his title." See also *Usther* v. *Ricks*, 10 Adol. and Ellis, 714. In the present case, however, it is not indispensable to determine whether we will relax the ancient rule to the extent contended for. It is clear there was not gross negligence on the part of either defendants ; and not even a case where the suspicion of the parties ought necessarily to have been excited.

On the other hand, looking to the conduct of the plaintiffs, there was, if not positive negligence on their part, at least something very nearly approaching it. The bill was sent by a precarious channel of transmission, endorsed in blank. If it had been specially endorsed by the plaintiffs' agent, this litigation would not have occurred.      *Judgment affirmed.*